UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CANDACE ALSTON,

    Plaintiff,

v.

TRANSUNION, LLC, *et al.*,

    Defendants.

Civil Action No. TDC-14-1180

**MEMORANDUM OPINION**

This Fair Credit Reporting Act case is before the Court on Plaintiff Candace Alston's Motion for Partial Summary Judgment and her Motion for a Preliminary Injunction. ECF Nos. 23 and 47. Alston has brought suit against Trans Union, LLC and Experian Information Systems, LLC for what she alleges are negligent and willful violations of the FCRA based on the agencies' reporting of delinquencies on a Wells Fargo mortgage account, and on the agencies' investigative procedures in the wake of Alston's challenges to their reporting of that account. The issues before the Court are whether Alston has alleged sufficient undisputed facts to establish that Trans Union and Experian violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, such that she is entitled to judgment as a matter of law, and whether Trans Union and Experian should be enjoined from reporting the Wells Fargo mortgage account as delinquent for September and October 2011. The Court has reviewed the pleadings and supporting documents and heard oral argument on November 3, 2014. For the reasons outlined below, both motions are DENIED.

## BACKGROUND

### I. The Monarch/Wells Fargo Account

On November 12, 2010, Alston obtained a mortgage from Monarch Bank for $102,212.00. Experian Opp'n, Ex. 7, ECF No. 40-11. The terms of that mortgage required Alston to make monthly payments of $811.53, with payments to begin in January 2011. Mot. Sum. J., Ex. A.1, ECF No. 23-1. On November 16, 2010, the resulting Deed of Trust was recorded in the Prince George's County Circuit Court Land Records in Book 32175, pp. 5-17. Experian Opp'n, Ex. 8, ECF No. 40-12.

Alston immediately disputed the validity and terms of the loan. In documents dated November 12, 2010—the day she signed the original loan documents—Alston unilaterally executed riders to the Deed of Trust and the Note. The rider to the Deed included the following provision:

> Any offset or claim which Borrower has now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

Experian Opp'n, Ex. 9 at 3, ECF No. 40-13. The rider to the Note indicated that the revised Note "supercede[d]" sections 1, 2, and 10 of the original Note, and contained a provision allowing Alston to "make all payments under this Note in the form of cash, check, money order, or promissory note." Experian Opp'n, Ex. 10 ¶ 2, ECF No. 40-14.

In a November 15, 2010 letter, Alston informed Monarch that she believed that "[t]he conditions [under] which I executed the Note and Deed of Trust may render both instruments void." Experian Supplement, Ex. 1 at 2, ECF No. 77-1. Specifically, she alleged that she was denied adequate advance opportunity to review the loan documents and also that she was

"[d]enied an opportunity to negotiate the terms and conditions" of the loan. *Id.* She informed Monarch that "[n]ow that [she] ha[d] had sufficient time" to review the Note and Deed, she had created riders to those documents altering their terms to her satisfaction. *Id.* at 3. On December 20, 2010, Alston sent a second letter to Monarch again contesting the validity of the loan and also explaining the terms of the riders:

> The Rider to Deed of Trust is now a part of the Deed of Trust. And the Rider to Note is now a part of the Note. I will record the Rider to Deed in Maryland Public Land Records. If you accept the Deed of Trust with the Rider to Deed and the Note with the Rider to Note, then you agree that:
>
> 1) Candace Alston will be credited for the Deposit of the Note; and
> 2) Monarch Bank is entitled to only the interest payments, not principal payments; and
> 3) Monarch Bank will provide Candace Alston with access to the demand deposit account created by her deposit or Monarch Bank will only receive the interest portion of the mortgage payments.

Experian Supplement, Ex. 2 at 2-3, ECF No. 77-2. On December 29, 2010, Alston recorded the Deed of Trust Rider at Book 32200, pp. 487-504 with the Prince George's County Land Records Division. *Id.* at 8-9.[1]

In early December 2010, Monarch sold Alston's mortgage to Wells Fargo. Experian Opp'n, Ex. 11, ECF No. 40-15. In a letter dated December 7, 2010, Monarch Bank informed Alston of the change in loan servicers. *Id.* In a letter dated December 27, 2010, Wells Fargo informed Alston that it was now servicing the loan. Mot. Sum J., Ex. D, ECF No. 23-5. In a January 20, 2011 letter to Wells Fargo, Alston disputed Wells Fargo's ownership of the loan,

---

[1] Although the parties did not submit specific evidence of the date of recording, the date is available through the Maryland Land Records database, MDLANDREC, *available at* http://mdlandrec.net. The Court takes judicial notice of the date of filing pursuant to Fed. R. Evid. 201(b)(2).

3

asserting that she had "received nothing from Monarch Bank verifying this alleged sale." Experian's Opp'n, Ex. 14 at 2, ECF 40-18. She further asserted that the "loan documents were signed under duress," which, she suggested, "may render the Note and Deed void." *Id.* She concluded that because Wells Fargo's ownership of the "alleged 'loan' [wa]s under dispute," she was entitled to "withh[o]ld [payment] until the dispute is resolved." *Id.* Alston indicated that to establish its valid ownership of the loan, Wells Fargo was required to provide her with, among other things, "a properly endorsed certified copy of the Note as it exists today." *Id.* at 3.

In a letter dated February 3, 2011, Wells Fargo again advised Alston that it was the servicer of the loan and provided her a copy of the Note and Deed of Trust as originally signed by Monarch and Alston. Mot. Sum. J., Ex. C at 2-5, ECF No. 23-4. In a letter dated March 3, 2011, Alston continued to contest Wells Fargo's status as servicer of the loan and again questioned the validity of the underlying mortgage itself, asserting that "a bona fide dispute exists between myself and Monarch as to the origination of this alleged 'loan.'" Mot. Sum. J., Ex. D, ECF No. 23-5. She also challenged the Note and Deed that Wells Fargo forwarded, explaining that both were "missing their respective Riders." *Id.*

Meanwhile, beginning in December 2010, Alston sent payments to Monarch for some portion—generally not the full amount—of her $811.53 monthly balance.[2] Experian Supplement, Ex. 5 at 2, ECF No. 77-5. Alston noted on each of these checks, "Do not deposit/cash before reading both Rider to Note and Deed of Trust Rider. Depositing/cashing this check constitute acceptance of the Amendments." *Id.* In a letter dated April 15, 2011, Monarch returned all of the checks uncashed. *Id.* Monarch explained that the checks, "as presented to

---

[2] Specifically, between December 2010 and April 2011, Alston submitted the following: Check 168 for $676.94; Check 171 for $134.59; Check 174 for $676.94; Check 163 for $946.12; and Check 183 for $811.53. Experian Supplement, Ex. 5 at 2, ECF No. 77-5; Ex. 13, ECF No. 77-13.

4

Monarch, are not acceptable," and that it would accept payment only with checks "without notes or annotations." *Id.* In a subsequent letter, dated June 7, 2011, Monarch reminded Alston that her loan had been sold to Wells Fargo and reiterated that it "c[ould not] accept any check that has annotations that reference the filing of an unauthorized amendment to your Deed of Trust." *Id.*, Ex. 6, ECF No. 77-6.

In a letter dated July 5, 2011, Wells Fargo informed Alston—in response to her continued challenge to Wells Fargo's ownership of the loan—that it had a "valid loan and lien" on the property purchased with the November 2010 mortgage. Mot. Sum. J., Ex. E, ECF No. 23-6. It informed her as well that, as of the date of the letter, her mortgage was "in active foreclosure." *Id.* On August 4, 2011, Alston submitted a cashier's check for $6,492.24—a total of eight payments of $811.53—to Monarch Bank. Mot. Prelim. Inj. at 2. The check was made out to "Monarch Mortgage, Deed of Trust Book 32200, pp. 487-504," the land deed entry that included the Deed of Trust Rider that Alston had filed on December 29, 2010. Mot. Sum. J., Ex. F, ECF No. 23-7. Alston also annotated the payment coupon with "Deed of Trust Book 32280, pp. 487-504." *Id.* Monarch endorsed the check to Wells Fargo. *Id.*, Ex. G., ECF No. 23-8.

Wells Fargo refused to accept the check. Mot. Sum. J. Ex H, ECF No. 23-9. On September 6, 2011, A Wells Fargo employee emailed the Institutional Risk Management ("IRM") Repurchase Responses division of Wells Fargo describing the check and asking how she should proceed. *Id.* The employee noted that the check was made payable to "Monarch Mortgage/Deed of Trust Book 32280 pp. 487-504." *Id.* IRM instructed the employee not to cash the check. *Id.* The next month, Wells Fargo transferred the loan back to Monarch. Experian Supplement, Ex. 8 at 2, ECF No. 77-8. In a letter dated October 28, 2011, Wells Fargo informed Alston of the transfer. *Id.* The cashier's check was then forwarded back to Monarch,

and the endorsement from Monarch to Wells Fargo was crossed out with the explanation, "Endorsement voided." Mot. Sum. J. Ex G, ECF No. 23-8; Reply to Experian, Supp. Decl. ¶ 10, ECF No. 42-1.

Alston made no mortgage payments, either to Monarch or Wells Fargo, in September or October 2011. November 3, 2014 Hearing at 4:15 p.m., *Alston v. Equifax* (TDC-13-1230) and *Alston v. Trans Union, et al.* (TDC-14-1180). On November 16, 2011, Monarch cashed the August 2011 cashier's check only after crossing out the notation regarding the altered Deed of Trust. *Id.* at 4:14-4:16 p.m. That same day, Monarch also cashed a check from Alston for $2434.59—or three payments of $811.53—dated November 7, 2011. *Id.* That check also contained the notation "Deed of Trust Book 32200 pp. 487-504, a notation that Monarch crossed out before cashing the check. *Id.*; Experian Supplement, Ex. 12 at 4, ECF No. 77-12.

**II.     The Trans Union and Experian Credit Report Disputes**

In July 2011, Alston ordered her credit report from Trans Union and Experian. Mot. Sum J., Exs. I.1, I.2, ECF No. 23-10. Both credit reporting agencies listed her as 120+ days past due on her Wells Fargo mortgage account, with a past due balance of $4,057. *Id.* Alston filed online disputes with both agencies. Trans Union Opp'n, Ex. A ¶ 13, ECF 37-2; Experian Opp'n, Ex. 5 ¶ 15, ECF 40-9. In her Experian dispute, Alston asserted that the information on the mortgage account was inaccurate specifically because Wells Fargo "d[id not] own or service [her] account." Experian Opp'n, Ex. 5 ¶ 4. In her submission to Trans Union, Alston did not elaborate on the basis for her dispute. Trans Union Opp'n, Ex. A ¶ 13. In response to the disputes, both agencies investigated the debt by contacting Wells Fargo through the Automated Consumer Dispute Verification ("ACDV") system. Trans Union Opp'n, Ex. A ¶ 14; Experian Opp'n, Ex. 5 ¶ 15.

On July 31, 2011, Wells Fargo verified the debt to Trans Union and updated Alston's past due amount, increasing it to $4,999; Wells Fargo also noted that the account was "in dispute." Trans Union Opp'n, Ex. A ¶ 15. On August 11, 2011, Wells Fargo verified the debt to Experian. Experian Opp'n, Ex. 5 ¶ 15. Wells Fargo reported that as of July 2011, Alston was 150 days past due, and that in August 2011 the account was "current/terms of agreement ... met." *Id.*

On September 22, 2011, Alston submitted another online dispute to Trans Union about the Wells Fargo account. Trans Union Opp'n, Ex. A ¶ 17. Trans Union contacted Wells Fargo through the ACDV system, and Wells Fargo verified the report and updated the past due amount to $7303.00 *Id.* ¶¶ 18-19. On June 19, 2012, Alston submitted a third dispute to Trans Union, this one by mail, contesting the validity of the Wells Fargo report.[3] *Id.* ¶ 22. She argued that the information about the Wells Fargo account was inaccurate because Monarch Bank, not Wells Fargo, was the issuer and servicer of the loan. *Id.* She included a number of documents in the mailing, including mortgage statements from Monarch, a "copy of the Note," and a mortgage interest statement issued by Monarch. *Id.* Trans Union submitted another ACDV to Wells Fargo, adding a brief notation about Alston's allegations. *Id.* ¶ 23. Wells Fargo altered the report by "deleting 'maximum delinquency of 120 days in 06/2011'" but otherwise validated the information. *Id.* ¶ 24. Trans Union subsequently forwarded the results of the investigation to Alston. *Id.* ¶ 25. On September 30, 2013, Alston submitted a fourth dispute to Trans Union, again by mail and again contesting the validity of the Wells Fargo report, based on her claim that

---

[3] Alston claims that she submitted a third dispute to Trans Union on November 21, 2011, but Trans Union contests this assertion, explaining that it never received any such dispute and pointing out that the letter Alston appends to her Motion as evidence of this filing fails to establish that the letter was ever sent. Trans Union Opp'n at 4, n. 2.; *see* Mot. Sum J., Ex. J.1. Because on a motion for summary judgment the Court must view the facts in the light most favorable to the non-moving party, the Court accepts Trans Union's account of these events.

Wells Fargo had never been entitled to collect payment on the mortgage. *Id.* ¶ 26. Trans Union submitted an ACDV to Wells Fargo, and Wells Fargo confirmed the accuracy of the report, adding that the loan had since been transferred to another lender. *Id.* ¶ 28. The results of the investigation were forwarded to Alston. *Id.* ¶ 29.

On or around November 1, 2013, Alston asked Trans Union to forward her a copy of its dispute resolution procedure. *Id.* ¶ 30. "In an abundance of caution," Trans Union again investigated the alleged inaccuracy and subsequently sent the results of that investigation, in which Wells Fargo confirmed the debt, and a description of its investigation procedures to Alston. Trans Union Opp'n at 5; Ex. A ¶¶ 30-33. On November 18, 2013 and again on December 23, 2013, Alston filed additional disputes, claiming in each that the report was inaccurate because it listed her Wells Fargo payment status in August 2011 as "OK" but listed her as 120 days late in September 2011. Trans Union Opp'n, Ex. A ¶ 37. Trans Union investigated the complaints and, in response to the December inquiry, Wells Fargo updated the August 2011 information to "unknown." *Id.* ¶ 41.

Alston's additional disputes with Experian followed a similar pattern. On November 21, 2011, Alston filed another dispute with Experian, by mail, about the Wells Fargo account.[4] Experian Opp'n, Ex. 5 ¶ 18. She enclosed in the mailing a copy of the August cashier's check and her own summary of the status of the account. *Id.*, Ex. 5.3 at 15-17. Experian informed Alston that because it had already investigated this dispute, it would not perform another investigation unless Alston supplemented her claims with additional "relevant information." *Id.*,

---

[4] Alston claims that she submitted a dispute to Experian on August 22, 2011, but Experian contests this assertion, explaining that it never received any such dispute. Experian Opp'n at 11; *see* Mot. Sum J. at 2. Because on a motion for summary judgment the Court must view the facts in the light most favorable to the non-moving party, the Court accepts Experian's account of these events.

Ex. 5 ¶ 18. On June 12, 2012, Alston submitted another dispute that, in Experian's estimation, "did not include additional relevant information sufficient to trigger a new reinvestigation," so none was performed. *Id.* ¶ 19. On September 21, 2013, Alston again filed a dispute, and Experian again indicated that she had provided insufficient new information to warrant a reinvestigation. *Id.* ¶ 20. On December 20, 2013, Alston filed another dispute, which Experian then forwarded to Wells Fargo through the ACDV process. *Id.* ¶ 21. Wells Fargo updated the account information to the extent of indicating that the loan had been transferred to another lender. *Id.*, Ex. 5.11 at 59.

### III. Procedural History

On July 16, 2013, Alston filed suit against Defendants in the Circuit Court for Prince George's County, alleging FCRA violations. The case was removed to this Court on April 10, 2014. ECF No. 1. On May 13, 2014, the Court (Grimm, J.) issued a Scheduling Order setting a deadline of November 17, 2014 for dispositive pretrial motions and instructing the parties that submission of dispositive motions was governed by Local Rule 105.2(c). Order at 2, 4, ECF No. 19. On May 20, 2014, Alston, without prior consultation with defense counsel, filed her Motion for Partial Summary Judgment. Trans Union Opp'n, Ex. C ¶ 3, ECF No. 37-34. Trans Union responded to the motion on June 27, 2014; Experian responded on July 3, 2014. Alston submitted Reply Memoranda of Law on July 24, 2014 and July 14, 2014, respectively. On July 24, 2014, Alston filed a Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 47. On July 25, 2014, the Court denied the temporary restraining order and deferred consideration of the preliminary injunction pending additional briefing by the parties. ECF No. 50. On August 1, 2014, Trans Union and Experian each submitted a Response in Opposition on

August 1, 2014. ECF Nos. 52, 53. Alston filed her Reply Memoranda on August 8, 2014. ECF Nos. 56, 57.

## DISCUSSION

I.   **The Motion for Partial Summary Judgment**

   A.  **The Timing of the Motion**

Alston submitted her Motion for Partial Summary Judgment only one week after the Court issued a Scheduling Order setting a November 17, 2014 deadline for dispositive motions and instructing the parties that the submission of dispositive motions was governed by Local Rule 105.2(c), which contemplates that parties will coordinate the filing of dispositive motions. Alston submitted the Motion without contacting either counsel for Trans Union or counsel for Experian. This Court would be within its rights to deny the Motion solely on those procedural grounds. *See McReady v. O'Malley*, 804 F. Supp. 2d 427, 438 n. 5 (D. Md. 2011) (striking a motion for summary judgment filed in violation of Local Rule 105.2(c)). However, because the Court believes that a resolution of some of the issues presented in the Motion for Partial Summary Judgment may prove useful to the parties at this stage of the case, the Court turns instead to the merits of Alston's filing.

   B.  **Legal Standard**

Under Federal Rule of Civil Procedure 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), who has the burden of showing a genuine dispute exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Here, Alston fails to demonstrate that there is no genuine issue as to any material fact, such that she is entitled to judgment as a matter of law. Her motion must therefore be denied.

### C. The Inaccuracy Requirement

Alston alleges that Trans Union's and Experian's reporting of the Wells Fargo mortgage account violated two provisions of the FCRA: 15 U.S.C. § 1681e(b), which requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" of their reports, and 15 U.S.C. § 1681i(a), which requires credit reporting agencies, upon receiving notice of that a consumer is disputing information in a credit report, "to conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." *See* Mot. Sum J. at 4-5. Courts have read a threshold "inaccuracy" requirement into both of these provisions.

#### 1. Section 1681e

The United States Court of Appeals for the Fourth Circuit has held that in order to establish a violation of section 1681e, a plaintiff must show both "(1) the consumer report contained inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 415 (4th Cir. 2001). Other circuits have adopted the same requirement of inaccuracy. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 964 (3d Cir. 1996); *Guimond v. Trans Union*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 39 (D.C. Cir. 1984). Logically, if a credit report is not inaccurate, there has been no failure on the part of the agency to ensure maximum accuracy. Thus, liability cannot be established under this section without proving inaccuracy.

2. Section 1681i

Although the Fourth Circuit has not specifically addressed whether inaccuracy of a credit report is an element of a violation of 15 U.S.C. § 1681i, several circuits have read into the statute such a requirement. In *Carvalho v. Equifax*, 629 F.3d 876, 890 (9th Cir. 2010), the United States Court of Appeals for the Ninth Circuit held that although section 1681i "does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim," such a requirement is warranted because it is consistent with the overall purpose of the FCRA, which is "to protect consumers from the transmission of inaccurate information about them." *Id.* at 890 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009)). Three other circuits have specifically held that a showing of inaccuracy is a requirement for claims made under § 1681i. *See DeAndrade v. Trans Union*, 523 F.3d 61, 66-68 (1st Cir. 2008); *Wantz v. Experian Information Servs.*, 386 F.3d 829, 834 (7th Cir. 2004); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).

Following this precedent, judges in this district have adopted the inaccuracy requirement. *See, e.g., Brooks v. Midland Credit Management*, WDQ-12-1926, 2013 WL 1010455 at *7 (D. Md. Mar. 13, 2013) ("Inaccurate information is an element of a claim under §§ 1681e(a) and 1681i(a)"); *Brown v. Experian*, JKB-12-2048, 2012 WL 6615005 at * 3 (D. Md. Dec. 17, 2012) ("In order to state a claim for failure to comply with § 1681e(b), Plaintiff must allege that a consumer report contained inaccurate information. The same is true of § 1681i(a).").

A requirement that a plaintiff establish that the credit report is inaccurate is consistent with the purposes of FCRA, which is focused on preventing inaccurate credit reports from harming individual subjects of those reports. *See Dalton*, 257 F.3d at 414 ("Congress found that in too many instances agencies were reporting inaccurate information that was adversely

affecting the ability of individuals to obtain employment."). Section 1681i itself focuses on this purpose, in that it requires a credit reporting agency "to conduct a reasonable reinvestigation to determine whether . . . disputed information is inaccurate." 15 U.S.C. § 1681i(a). If the disputed information proves to be accurate, there would be no unfair harm to the subject of the credit report, regardless of the scope and effectiveness of any reinvestigation. Thus, this Court agrees with the overwhelming weight of precedent that inaccuracy of the credit report is a necessary element of a successful claim under section 1681i.

### D. Genuine Issue of Material Fact on Inaccuracy

With inaccurate information an essential element of a claim under sections 1681e and 1681i, Alston's Motion must fail. The record reveals that, at a minimum, there is a genuine issue of material fact whether the delinquency references on Alston's credit reports relating to the Wells Fargo account were inaccurate. When viewed in the light most favorable to the non-moving parties, the evidence tends to indicate that they were accurate.

Alston's specific contention is that Trans Union's and Experian's reporting of September and October 2011 as 120+ days past due, after each had reported the account "OK" or "Current" in August 2011, is patently inaccurate: she could not be current one month and 120 days' past due the next. Mot. Sum. J. at 6. Alston's attempt to cast her claim as one of simple arithmetic ignores the multiple complications in her payment history, which appear to be the result of her unseemly attempts to escape from the terms of the loan. During the period that Wells Fargo owned Alston's loan, Alston did not send any mortgage payments to Wells Fargo, despite being informed multiple times in writing that Wells Fargo was the legitimate servicer of her mortgage. Instead, she vigorously contested whether Wells Fargo properly owned the loan. Alston suggests that during her dispute with Wells Fargo, she remained current on her mortgage by sending

payments to Monarch, the original servicer of the loan. *See* Mot. Sum J. at 2 ("Plaintiff continued to send her mortgage payments to Monarch Bank."). However, the evidence suggests that she did not make such payments in an acceptable form. Rather than making monthly payments under the terms of the mortgage, Alston appears to have sought to use purported payments to advance a scheme to undo the mortgage itself. In December 2010, Alston had unilaterally executed riders to the Deed of Trust and the Note that, if accepted, would have drastically changed the terms of those documents. For example, as Alston herself explained to Monarch, the rider to the Deed "entitled [Alston to make] only the interest payments, not principal payments" on the loan. Experian Supplement, Ex. 2 at 2, ECF No. 77-2.

Alston then sought to use her mortgage payments to induce Monarch to acquiesce to her revised terms. Between December 2010 and July 2011, Alston annotated every check she sent to Monarch with the condition that "Depositing/cashing this check constitute acceptance of the Amendments." Although the August 2011 cashier's check was not as extensively annotated, it also indicated that it was to be applied to Alston's revised Deed of Trust. Thus, between December 2010 and November 2011, Alston made no unconditional payments on the loan.

As a result of these notations, Monarch returned all of these checks to Alston uncashed with the exception of the August 2011 cashier's check. Because Wells Fargo refused to cash that check, no payments were credited to the mortgage until November 2011, when the loan and check were returned to Monarch, which then cashed that check after striking out the notation regarding the altered Deed of Trust.

The refusal by Monarch and Wells Fargo to accept Alston's conditional payments was wholly reasonable. At common law, the doctrine of accord and satisfaction dictates that "if a check [for partial payment] bearing a notation indicating that it is offered in full settlement is

14

delivered to the creditor, the retention and use of the check by the creditor constitutes an accord and satisfaction." 29 Williston on Contracts § 73:44 (4th ed.). While accord and satisfaction refers specifically to a creditor's acceptance of a partial payment offered to fully settle a debt, the underlying logic of the doctrine is that by cashing a check, a creditor accepts any terms and conditions laid out on that check. In *Air Power, Inc. v. Omega Equipment Corp.*, 459 A.2d 1120 (Md. Ct. Spec. App. 1983), the Maryland Court of Special Appeals concluded that a creditor who deposited a check that had been "tendered in full satisfaction of all claims" had, by such action, accepted the proposed settlement of the debt. *Id.* at 1124. Relying on Maryland Court of Appeals precedent, the court reasoned that the recipient of a check "c[an]not qualify the effect of his actual use of the check and appropriation of the defendant's money through its certification, in view of the terms of compromise under which it alone could be used. It was the *use* of the check that determined the question of the acceptance of the offer." *Id.* at 1123 (quoting *Scheffenacker v. Hoopes*, 77 A. 130, 133 (Md. 1910)). By this reasoning, if Monarch or Wells Fargo had cashed Alston's checks, there would have been a legitimate possibility that they would be deemed to have accepted Alston's "terms of compromise" that appear to relieve Alston of the obligation to pay the bulk of her mortgage.

Thus, although Alston had submitted checks to Monarch between December 2010 and October 2011, when viewed in the light most favorable to the defendants, a reasonable factfinder could conclude that none of those payments were earnest ones—payments made in fulfillment of the original terms of her loan agreement—and Monarch and Wells Fargo accordingly made the reasonable decision not to cash those checks or credit the payments to Alston's account. Accordingly, a reasonable factfinder could also conclude that the credit reports' notations that she had been past due as late as October 2011 were, in fact, accurate. There is certainly an

incongruity in the reports insofar as they indicate that she was "OK" or "Current" as of August 2011 and then 120 days late in September, but a reasonable factfinder could conclude that those August notations were placeholders inserted to give Alston the benefit of the doubt while the lenders sought to interpret the confusing and misleading payment conditions proposed as part of Alston's multi-faceted scheme to contest and alter her loan agreement.

On the evidence presented to date, these conclusions are not merely possibilities. Given the clear evidence that Alston sought to use conditional payments to manipulate the lenders into giving up their rights under the loan, and made no unconditional payments on the loan during the period in question, there is a strong likelihood that the entries indicating that she was past due on the loan were accurate. Because Alston cannot show, as she must, that no reasonable factfinder could conclude that the credit reports' notations were accurate, Alston's Motion for Partial Summary Judgment is denied.

## II.     The Motion for a Preliminary Injunction

Alston also asks this Court to "enjoin the Defendants from reporting inaccurate information to Plaintiff's credit report." Mot. Prelim Inj. at 1. Specifically, Alston seeks to enjoin Trans Union and Experian from reporting that her mortgage was 120+ days past due in September and October 2011. *Id.* at 2.

### A. Legal Standard

To obtain a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). Because a preliminary injunction is "an

extraordinary remedy . . . [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Prior to 2009, the Fourth Circuit followed a "balance of hardship" approach to preliminary injunctions, considering all four *Winter* factors, but "allow[ing] each requirement to be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (citing *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977)). However, *Real Truth* invalidated this approach, and it "may no longer be applied" in the Fourth Circuit. *Id.* As a result, a plaintiff must satisfy each requirement as articulated. *Id.*

### B. Analysis

To meet the first requirement, plaintiffs must "clearly demonstrate" that they "will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth*, 575 F.3d at 346-347 (emphasis in original). In order to succeed on her Motion, therefore, Alston must clearly demonstrate that she will likely succeed on her claim that Trans Union's and Experian's current report of her mortgage account is inaccurate. She fails to carry this burden.

Alston's Motion for a Preliminary Injunction fails for the same reason her Motion for Partial Summary Judgment fails: the Trans Union and Experian reports that her Wells Fargo account was 120+ days delinquent in September and October 2011 are arguably, perhaps likely, correct. *See supra* part I. D. From December 2010 through October 2011, Alston did not submit any mortgage payment in accordance with the terms set out in her original loan agreement. Until November 2011, neither Monarch nor Wells Fargo cashed any of the conditional payments she submitted, a wholly reasonable response to Alston's annotated checks designed to extract a

17

change in the terms of the loan. By September and October 2011, therefore, Alston arguably had not made an earnest mortgage payment in more than six months. Accordingly, Alston cannot demonstrate that she will likely succeed in her claim that the Trans Union and Experian reports that her Wells Fargo mortgage was 120+ days delinquent for September and October 2011 are inaccurate.

Because Alston fails to establish a likelihood of success on the merits, she is not entitled to a preliminary injunction. *See Real Truth*, 575 F.3d at 347. The Court need not, and so does not, consider the remaining three factors.[5] *Id.*

## CONCLUSION

For the foregoing reasons, Alston's Motion for Partial Summary Judgment and her Motion for a Preliminary Injunction are DENIED. A separate order follows.

Date: November 13, 2014

THEODORE D. CHUANG
United States District Judge

---

[5] The Court analyzed these factors under substantially similar facts in response to Alston's Motion for a Preliminary Injunction in the related case of *Alston v. Equifax*. *See* Memorandum Opinion on Motion for Preliminary Injunction, *Alston v. Equifax*, No. TDC-13-1230 (D. Md. Nov. 13, 2014).